Good morning. I would like to reserve three minutes for rebuttal. I would like to begin with a quote from Berger of the United States. As the quote in Berger said, the goal is not to win at any cost but to preserve the system of justice that is worthy of respect because it secures convictions that are hard won but fairly achieved. In this case, it is clear from everything that transpired at the trial court level that the defendant was denied a fair trial. The government, in order to prove the conspiracy charge in court one, the government relied on bolstering the witness' testimony. Filling in the gaps, not through witness testimony but through the government's own statements. Point in fact, whereas Mr. Chesterfield, who was the government's key witness, Mr. Chesterfield testified about the 18 kilograms of cocaine that was taken from him or seized at the airport at the time of his arrest. Mr. Chesterfield, out of nowhere, testified that they, I think they said it was 18 kilograms of cocaine. The government then turns around in cross-examination throughout the trial. They, instead of referring to what they knew that was seized, to the 18 kilograms of cocaine, the government takes it and repeatedly says before the jury, 22 kilograms of cocaine. Is the difference between the gross and the net weight, is that what it comes down to? I don't think so because the chemist testified about the weight. I think the chemist testified about the weight was 18,000 plus. That was the net weight, which is without the packages, and I'm wondering if the difference in the number was what it weighed with the packages. I understand your point, but I... But I think also as officers of the court, we have to be cognizant that the jury is paying attention to what the government, you know, says. The government is saying 22 kilograms of cocaine. The government very well knew that the seizure was strictly 18 kilograms of cocaine, but that fact was put before the jury on a number of occasions. But there were questions, right? And didn't the district court instruct the jury that questions aren't evidence, answers are? Yes, yes. But again, we're going to talk about the cumulative effect of all of the court... Before we get to cumulative effect, though, that's kind of a downstream issue that's going to rely upon other errors that you claim took place here. And let me indicate what I think everyone already knows. We know from our clerk of court that Judge McKee is present, albeit from a distance. Judge McKee, I should have said good morning at the outset, but I'll say it now. Good morning, too. As I listen, I'm a woman, what difference does it make? So I understand Constance's argument, and I've used that brother's site numerous times myself in opinion. But in the quote of the old TV commercial, where's the beef? 42 grams versus 18 kilograms. Give it to 4 kilograms, and maybe you're going to weave this into your cumulative argument. But I can't see how that would be prejudicial. The guy's got the cocaine, where's the 18  kilograms? Well, even if we look at it even more in-depth now, the government's evidence, Mr. Chesterfield was the government's key witness in this case. The key witness in this case failed to implicate Mr. Hall in any way. But nonetheless, that evidence was key to the government's charge in Cont I. Now, the key with respect to conspiracy, we have to show that unity of purpose. The agreement. There was absolutely no evidence whatsoever to tie Mr. Hall to this conspiracy, this conspiracy that was charged in Cont I. No evidence? There was no evidence. I mean, what we had, we had some testimony from Mr. Carey. Mr. Carey testified about his actions, and he testified that what he delivered to West Palm Beach, I think it was, was in fact cocaine. But he indicated the individual who came down, who he identified as snide, and he identified him in a courtroom as being Mr. Hall, he indicated that this Didn't Mr. Carey testify that Richardson directed him to Hall's home, and at Hall's home, Hall then provided drugs to Carey? Isn't that in the trial record? No, no. What the evidence was, or what the testimony was, is that, in fact, Richardson did direct him to Hall's home, but there was nothing on this court's jurisprudence This court's jurisprudence makes clear that there has to be some evidence that the defendant had knowledge. Now, Carey says that Knowledge of what? It doesn't require him to know all the participants? No, not all the participants, but he has to know, for instance, that Nor does, nor certainly does it require him to know what all the various participants did in furtherance of the conspiracy. But we have to have something in there, not just an inference, but we have to have something in there that he knew that the object of the conspiracy was to possess and distribute controlled substances or drugs, cocaine. But the jury had before it three separate transactions where at Mr. Richardson's direction, Hall and Carey meet. Hall delivers cocaine to him in the back of the apartment area, and we have a separate episode, I know, with Ms. Blyden, and I know there was an acquittal there, but a discussion about the presence of drugs from her perspective. The jury can draw that inference. One rational juror. It's a very deferential standard. Don't you have an uphill battle in making that argument? Well, the thing is, again, I don't want to gloss over the fact, again, that Mr. Carey simply said it was cocaine, but there was nothing there to show that Hall knew, because according to his testimony, this individual came down the stairs and just retrieved something from the trunk of the car. That's it. Nothing else. So we don't have any evidence showing his knowledge. And then with respect to Ms. Blyden, the evidence was abundantly clear that Ms. Blyden had opened the door, and it was, in fact, Haynes who opened the bag. But Hall was in the vicinity of all this activity. Yeah, Hall was in the vicinity. And remember, we're at such a difficult standard for you that only one rational juror has to make the conclusion that it was. And this dovetails into my larger argument here. Again, just like how the government bolstered and the government basically created facts that was not before the jury, the government in this instance, when the witness, Ms. Blyden, testified that he was in the kitchen, the government led her through leading questions to suggest that all of this was in the same room. And likewise, I think on the tail end, the question was asked, who was left behind, not what was left behind, something of that nature. So the government, in every instance, the government produced or the government testified as to dates and times that no witness testified to. The government testified the court had managed the government in this instance where the government I think on cross-examination, the government attributed the statement that he was smoking, so that he was smoking weed. And there was no testimony about him smoking weed. That's a different subject, and I know that we have some questions about that, the nature of that questioning. So I understand what you're talking about in terms of that cross-examination of Mr. Hall's sister. I understand that. Yes. Could I ask you, though, about, you make an argument about variance, but it seems to me it's just a repeat of your sufficiency argument. And if that's the case, fine, then at least we know we're talking about sufficiency. But it doesn't really sound like a variance argument, because a variance argument is an indictment charges X conspiracy, but a different conspiracy was proven in front of the jury. Your argument seems to be there was a drug conspiracy, but Mr. Hall wasn't a drug conspiracy. So how mistaken, please tell me, because the variance argument I didn't quite follow, it really sounded like a sufficiency argument. Perhaps. But in this instance, I think, you know, I would be hard-pressed if I did not point out, in fact, that whereas the government charged unequivocally a single conspiracy, the evidence at trial did not produce as such. It did not appear, because we had different individuals. Well, that sounds like you're saying insufficiency. I mean, I don't think you answered Judge Schwartz's question. I mean, is your argument insufficiency of the evidence or is your issue that there was a variance in the indictment? Even with respect to if we're looking at it as an insufficiency argument, the evidence was insufficient to prove conspiracy. The evidence was – Again, we just want to make sure that you understand that the variance and the insufficiency – your articulation of variance seemed like a repeat of a sufficiency argument. And if it's a variance argument, then you're going to have to tell me what conspiracy was charged and what conspiracy was proven. If your argument is sufficiency, then I completely understand your argument. So maybe you can help me with that. It's a sufficiency argument, even though I think that, again, I would be hard-pressed if I did not make the argument that there was a variance in the evidence, because what we had here, it seems as if the left hand did not know what the right hand was doing. And Mr. Howell was not a part of any of it. I mean, yes, Ms. Blyden testified to her actions that implicated Mr. Howell, but she did not indicate that he opened the bag that contained the cocaine, that he did anything with respect to the cocaine. Likewise, Mr. Carey, he says that on three instances – and I don't want to run out of time. I'm down to two minutes here. Another thing is, is that coming to the – and there's the issue about the government's witness, Mr. Carey. He was asked unequivocally about prior testimony pertaining to Mr. Howell having a bag with 14 kilograms of cocaine. He denied any knowledge of that, but apparently after he testified, something took place off the record and whatnot. And when he came back before the court, he indicated that he was corrected by the government, and he corrected himself. And that deprived the defendant of the right to effectively cross-examine him before the jury. This correction came off of the record. My client was entitled to the opportunity to rigorously cross-examine all of the government witnesses right there before the jury so that the jury could get the whole picture. He was denied of that right. But you obviously knew that there was – it wasn't really testimony. As I read the cross-examining off of. And I think the question was something like, did you tell the agent that Mr. Howell had 14 kilos or additional kilos? And the answer to that in front of the jury was no. No. Then there's a proceeding that takes place after the trial, and I do have just sequentially trying to figure out how that happened. But put that aside. He then says, yeah, I told the agent, but I was mistaken. It was Barry. So how does that work? First telling the agent that he implicated your client, and then he would testify, no, I was mistaken. It was someone else. I don't see intentional false statement, and I really don't even see how you're prejudiced by that several-line inquiry. Well, the thing about it, any time you're able to point, oh, that a witness, a government witness, you know, lied in front of the jury, that carries – you know, that takes you a long way. And I think that because he knew it and he denied it at that instance, you know, we didn't get that opportunity before the jury. Let me shift to another issue in this case, one that you have raised, and that goes to the stipulation of the chain of custody. You were not trial counsel, am I correct? I was not. All right. I must admit that in a lot of years of practice and judging, this is the first I've seen a party attempt to run away from a stipulation, especially a stipulation that was not only entered on the record, but that also on the record received the assent of the client, in this case the defendant Hall. You assured or your predecessor's counsel assured the district court that you were not only agreeing to it, but that you discussed it, that the counsel had discussed it with Mr. Hall. You didn't raise any evidentiary objection, Hall didn't, concerning the admissibility of the evidence. Why now? How can you do that now? Well, I'm sort of a little baffled by – it's really a malpractice argument, not a malpractice argument. But I mean, the fact that it goes to the heart of the case, I mean, this alleviated the government of a tremendous burden that they had at trial. And I think that, you know, as a telecounsel – Let's assume that you're correct, that that was a tremendous burden. So what if, perhaps for tactical reasons, trial counsel decided not to make a big issue out of chain of evidence, but instead focus on other issues? I think the Court, as gatekeeper, had an obligation to preclude the government from even entering to – preclude the parties, I'm sorry, preclude the parties from entering into the stipulation. I mean, the parties can't stipulate the law. They cannot stipulate. They cannot. But this is a factual matter that the parties can stipulate to. And, in fact, as Judge Smith said, there was an inquiry to make sure the defendant himself was on board with it. And experience has shown it's not unusual for issues of chain of custody, even DEA lab reports, to be stipulated to. And one could argue – because I can't – I couldn't figure out any prejudice to your client by the stipulation. And, in fact, strategically, your predecessor might have had a reason. For example, one less time or two less times witnesses are talking about the 18 kilos that were seized from Chesterfield at the airport. And so there might have been a strategic reason that would have explained why the stipulation was sensible. And why should a judge question the parties' method of proof? And I'm out of time, but allow me to say this. Let me just say from experience that having appeared before Judge Gomez on numerous occasions, I have had instances where something goes to the heart of a defendant's rights that the court inquires of the defendant himself directly. In fact, in this very case, Judge Gomez interceded at one point, not with respect to the stipulation, but with respect to some of the questions, which assumed facts, not in evidence, and about which you complain at this time. He chose not to do so with the stipulation. Maybe that says something in and of itself, that is, his silence. If – Judge McKee, do you have further questions? No, I wanted him to get into the whole prosecutorial misconduct thing. Did he say time for rebuttal? Yes, three minutes. Okay. Three minutes, was it? Yes. Yes. So you'll wait until rebuttal, Judge McKee? Yes, I'm prepared to do that. All right. Very well. And if I could just point out, I'm having a hard time hearing him over. Yes, the audio is a little muffled. It may be – I mean, we've changed the volume somewhat a while ago, but maybe, Judge McKee, if you held the phone a little farther away, that might eliminate some of the distortion we're getting. Well, is that any better? I'm using an earpiece. Maybe I should use my landline. All right. But we'll hear now from his bleacher. I think I'm getting the pronunciation correctly today. I may not be a quick learner, but, you know, in this case, I got it right. All right. Good morning, Your Honors. Assistant U.S. Attorney Jennifer Bleacher on behalf of the U.S. government. Ms. Bleacher, let me start with something that has concerned me about this case overall and about the performance of the government. And I readily acknowledge that you are not trial counsel. I've read the entire trial transcript carefully. In fact, just this past weekend or earlier this week, I'm curious about some back and forth between Judge Gomez and counsel, and it started at the very outset of this proceeding. It started really, as I recall, with what seemed to be a request from Ms. Smith to revisit the severance issue. Am I correct? That's correct, Your Honor. And I think Judge Gomez was fairly clear at the outset that he didn't intend to do that. But it also seems that Ms. Smith persisted and that it caused the temperature in the room, if you will, to rise a bit. Would you say, just by a reading of the transcript, that that's an accurate impression to derive? Attorney Smith did try to raise the issue again, I believe, two times, and it seems to me from the transcript that Judge Gomez was becoming a bit frustrated because he felt he had already ruled on the issue and wanted to move on. And I think, again, it's sometimes difficult to really get the tenor, if you will, the mood, the tone of what is happening in a courtroom from the reading of a bare and cold record. But there were frequent instances in which Judge Gomez and Ms. Smith had, I don't want to call them confrontations, but certainly some differences of opinion as to the propriety of questions, specifically, as I think was raised during the course of Mr. Jean-Baptiste's presentation here, a series of questions that were asked by Ms. Smith which seemed to suggest facts that were not in evidence. Do you recall the portion of the record I'm referring to? I know what you're referring to, Your Honor. All right. With that in mind, and the record, it seems to me, being fairly clear on that, I was rather disturbed to see in the government's brief, specifically I think at page 25, a response to the appellant's argument on prosperity misconduct, whether or not this rises to the level is not the basis of this question, but the statement, there is no evidence on the record to support Hall's claims, that is, that the government was improperly putting evidence before the jury by way of leading questions and suggestions. That's hardly an accurate characterization. There is no evidence on the record to support Hall's claims. I mean, clearly Judge Gomez would have thought there was. Your Honor, again, as you noted earlier, I was not trial counsel and was not involved in the drafting of the brief. Nevertheless, I'm here to address these issues. And what I would say to that is that the record, although messy, is quite clear that the prosecution demonstrated outside the various complaints raised by appellant in this case that Craig Richardson was directing a conspiracy to transport drugs from the Virgin Islands to Florida, and they were distributed via West Palm Beach, where Mr. Berry lived, and Orlando, where Mr. Hall lived. And that is all about the structure of the conspiracy, and in and of itself inquiry into those areas would not seem to be inappropriate. But what about the suggestion that Ms. Samuel saw hundreds of thousands of dollars quote cleaned at Hall's home and asked her about Odoban, an accounting machine? From my reading of the record, there's nothing about those concepts anywhere in the record other than the mention of them by Ms. Smith in the cross-examination. You're correct, Your Honor, that statements regarding the accounting machines and the cash, and I believe there was also reference to a spray used to make the place smell a certain way, none of that was elicited on direct testimony. So isn't that actually testimony by a prosecutor, not testimony by a witness, such that the intervention of the trial judge was appropriate here? Ms. Smith was conducting a cross-examination and trying to impeach Ms. Samuels, who was there being put forth by the defendant. Too vigorously. I don't know. I realize you're not trial counsel, and I'm not calling you on the carpet, Ms. Bleacher, but speaking only for myself, I find this disturbing, and I was a prosecutor. Me too. I find it very disturbing. Your Honor, I'm not going to disagree that some of the questions reached areas that may have been more properly addressed on direct testimony. I know that Ms. Smith said during a separate colloquy with the judge that she had  to testify, but then withdrew their cooperation agreement to testify. So is that your basis, that there was a, quote, good faith basis for the questions? Is that why you're bringing that point to our attention? What I'm trying to say, Your Honor, is, yes, that there was a good faith basis, but also that there's no indication here that the testimony that was being elicited was being brought in bad faith. It may have been an issue of confusion on Ms. Smith's part with respect to you. Well, that confusion should have been eliminated by the time the appeal was taken, the government's brief was being written, and there's a statement to the effect that there was no evidence to support Hall's claims relative to the misconduct. I believe what the intent of that statement was, was not to make a statement along the lines of the, you know, to dispute the fact that certain testimony was, or certain facts were raised by Ms. Smith on cross and not on direct examination. The point there is more to the effect that the testimony that was being allegedly brought forth improperly did not prejudice the defendant, did not rise to a level of prosecutorial misconduct. Well, you could have said that, Ms. Bleacher. Now, at this point, we are at the appellate level, not at the trial level, and you are appellate counsel here today. And in terms of prejudice to the defendant, let me remind everyone that there was also a question from Ms. Smith intended to suggest to the jury that Mr. Hall was I think the question actually was, did you also not see your brother, Mr. Hall, smoking weed the whole hour they were in the house? Why? Your Honor, so earlier in that, in the testimony, the direct testimony from Ms. Blyden, Ms. Blyden had testified that during the exchange when Mr. Hall and Mr. Haynes were present for the pickup of the drugs, that they had been smoking. The testimony listed on direct had been that they were smoking. Ms. Blyden did not testify as to what they had been smoking. And so it may be the case that during this cross-examination Does that mean then that the cross-examination involved a question that itself drew an inference? I believe the question was improper. The court called out Ms. Smith on that question and then asked for defense counsel's input as to the impropriety of that particular question alone, not the additional questions that had been asked. And the court did issue a curative instruction and asked the jury to disregard that statement. I appreciate your candor in that response to Ms. Butcher. I do. But so you see the issues in the record that have concerned at least me and I think has been articulated by Judge McKee and through other questions that we find this rather disturbing. But let me go behind some of that, to be fair. And I mean this just because I am concerned about the entire proceeding. And that means fairness to the government as well. There seemed to be a great deal of tension, at least from my standpoint, from my reading, between Judge Gomez and Judge Smith and Ms. Smith. It's not only at the outset, but exchanges over evidentiary issues. I believe that that is my reading as well, Your Honor. And in fact, to the extent that at one juncture, and this followed a break in the proceedings, Ms. Smith asked for, I think, two minutes to go to the restroom. And the response from the judge was, well, we just took a break. Well, Ms. Smith rejoined her words while I was talking with witnesses, to which Judge Gomez responded, well, all right, we'll take a one-minute break. Do you recall that? I do recall that, Your Honor. It seems a bit of an unusual exchange, let's put it that way, and one that certainly suggested to me some difficulties between the court and government counsel here. Your Honor, that is what appears on the record, and I do think that that contributed to some of the evidentiary issues, especially given the repeated demands by Judge Gomez to speed things along. Yes. There were repeated interventions in that regard suggesting the court's view, the evidence, wasn't necessary evidence or necessary production by the government out of an interest to quickly move the matter along. I agree with that, Your Honor. If I could turn your attention to a subject your adversary raised about the statements by Mr. Carey, where he did not say that he had told the agent previously about additional kilos of cocaine being in the presence of Mr. Hall, and then there's this separate proceeding. So my first question is, I could not decipher from the docket how that proceeding came about, so just for my education, if you could just tell me how that proceeding came about, then I have a couple other questions on this area. I'm actually not able to answer that question, Your Honor. It's unclear to me why there was a separate Rule 29 hearing held after the original Rule 29. Because I didn't see any paper. I just saw a date that several days after the trial, but you can't tell me how that happened. Trying to, you know, cognizant of the rules and limiting myself to the record here, that there does not seem to be an indication as to why that separate hearing was held. Okay. Well, thank you. At least I knew. I was the only one unable to un- Judge McKee. I was just saying, I was just not too muffled. I couldn't figure it out either. It was weird. To be in trial was weird. What I can say, so going back now to the trial where this occurred, an inquiry takes place. The witness says, I didn't say this to the agent. I didn't see anything from the government correcting that in any way. Can you explain why that is? Your Honor, I cannot speak to why the trial attorney did not go and correct that statement. What I will say is that the import of Keyshawn Carey's testimony regarding the activity with Mr. Hall regarding three specific pickups that he testified to that took place in Orlando at the direction of Craig Richardson, and Mr. Carey specifically testified that on the first occasion there were two packages, on the second occasion two to three packages, and on the third occasion four packages. The discrepancy between whether he had seen Mr. Hall with a 14 kilograms of cocaine appellant is attempting to claim that this was an intentional perjured statement. Mr. Carey had testified that he was doing pickups from two different individuals, Mr. Berry and Mr. Hall, and the Rule 29 testimony where he says that he was mistaken, that was an inaccurate statement and it was Mr. Berry, seems to be nothing more than some confusion on Keyshawn Carey's part as to which pickup he had been referring to rather than any malicious or deliberately perjurious statement that was being made by Keyshawn Carey. It certainly didn't negate the testimony he had already provided that he, at least on three occasions, had made three pickups from Mr. Hall's residence. Thank you. I had some questions about the sentencing issue. The pre-sentence report and the amount that the court was sentencing on was 136 kilograms, so I have a couple questions on that. One is, how do you get to 136? I could only get to extrapolating the number of trips, the average amount of kilos plus the 18, to about 128. I know it doesn't matter for the guideline range of 50 to 150, but I couldn't get to 136, so are you able to help me with that? I don't know that I can walk through the exact math, but it was a function of the average packages that Mr. Chesterfield testified he would bring on the trips in question. He said it was about 10, and then there was a discrepancy or conflicting testimony about 18 or 22 on the last trip, plus the amounts that Mr. Carey testified that he picked up. But wouldn't that be a double count? If we took the can – if the theory of the government's case is the source of all drugs that Carey retrieved was the Chesterfield folks, then that would be a double count, because I even tried that, and I'm like, this would be a double count. Your Honor, I'm not sure it's necessarily clear that the drugs that were picked up by Mr. Carey were the exact same drugs that were – that were smuggled in by Mr. Chesterfield. The idea here is that there was one conspiracy charge whereby Craig Richardson was directing, it appears, at least two couriers to bring drugs through the airport in St. Thomas to Florida, and that they were distributed either to Mr. Berry in West Palm Beach or Mr. Hall in Orlando. But – but my understanding from Carey's testimony was he – it was reported to him that the source got arrested. I'm paraphrasing. And from that, the inference would be the source, Chesterfield, was the reason why Carey couldn't get his drugs from – from Hall or Berry. That's the inference, correct? Or am I mistaken? You tell me. That is one inference that could be drawn from – from the evidence. Is that the inference that supports the jury's verdict? I think the – And would that be the inference that one would draw to support the 136 kilos? The inferences that would support the jury's verdict would be that Mr. – Mr. Richardson was directing a number of participants, including Hall, and Hall may not have had direct knowledge of what each of those participants were doing, but that multiple participants or multiple individuals were smuggling cocaine through the airport in St. Thomas, that they were being transported in some way. We know at least on one occasion that transportation was done by Kenia Blyden and perhaps others at the direction of Mr. Richardson and with the assistance of Jamal Haynes to Mr. Hall's residence. The jury could – could conclude either way, that the drugs that Mr. Chesterfield brought in were specifically the ones that were collected at Mr. Hall's residence, or they may be separate drugs that are part of the same conspiracy and properly attributable to – to Mr. Hall. But you can't get to 136. If you multiply 12 trips times 10, that's 120, plus 18 is – right? If there were 12 trips, but there were 11 trips plus, as we think, approximately 11 trips, it's 110 plus 18. There were – I believe there were 12 trips that were testified. That was – are you counting the – it might be – this may answer my question. If – are you saying 12 trips and then the one that there was an interruption by the arrest? So 12 times 10 is 120 plus 18 is 138. If he – I realize I'm well over time here, so let me just check. Yes. So on page 242 in the record, Mr. Chesterfield testifies that he took 12 flights for the organization. So you understood that to be 12 completed flights and then number 13 was the interrupted  Correct. That helps me. The next question I have on sentencing, and I think it started with the Chief, so we'll go over. Your adversary makes a point at sentencing on reasonable – we didn't inquire of him at argument – on foreseeability, how much drugs were going to tag to Mr. Hall. The sentencing transcript reveals that the trial counsel for Mr. Hall did not object and said they were going to go along with the pre-sentence report. Therefore, the district court did not have to make a finding specifically or give – you know, narrate on the record how it came to this number. It was not, from his point of view, disputed. Nonetheless, my question for you is how do we – what is our best basis for concluding that attributing 4136 to Mr. Hall is supported? Mr. Hall's participation in the conspiracy was proven via the existence of various players that were all being directed by one person, Craig Richardson. And in the testimony both from Ms. Blyden and from Mr. Carey, the indication was that Mr. Richardson had directed them to the houses and to Mr. Hall's house in particular or that Jamal Haynes, the same person in both instances, was coming to pick up – pick up drugs for distribution or to collect money. So you had various players that were involved in this conspiracy. There's a question raised by the appellant as to whether knowledge had been properly attributed to Mr. Hall, and you had the testimony of Mr. Carey saying that on three different occasions he picked up cocaine from Mr. Hall. And can you have Blyden testifying? And your response is going to what proved the conspiracy. My question is a relevant conduct 1B1.1 question. How do we get to what was reasonably foreseeable? What I'm trying to say, Your Honor, is that the prosecution demonstrated that Mr. Hall – that there was sufficient evidence to conclude that Mr. Hall was aware that he was part of a conspiracy to import drugs from St. Thomas to at least Orlando in Florida. And given that he was aware of the purposes and the ends of the conspiracy, it is reasonably foreseeable that quantities of drugs, up to the amount that is in the sentencing report here, would have been transported via those means. Thank you. Judge McKee, do you have any other questions of Ms. Leischer? I don't. I think that's my concern with some of the things that you really developed quite well in terms of asking questions that had no basis in the record. And I get to the point, I know that it responds to the harmless error sometimes, but, you know, that becomes a bath that cleanses all kinds of misconduct. It seems to me it's not certain this is the case. But at some point, we need to send a message that that sort of thing is just not going to be tolerated. I'm not sure I heard all of what Judge McKee said. I understood his question to say – to be referring to harmless error to say, nevertheless, that there should be something maybe done to prevent this type of conduct going forward. Is that – Yeah, that's right. Because otherwise, harmless error is something that's a perpetual method that lets – that legitimizes prosecutorial misconduct, assuming that's what was out there. And at some point – years ago, Joe Weiss brought a wonderful opinion about this. At some point, we need to just step in and do something. Again, I'm not sure this is the case. I'm not sure it's not the case either. Your Honor, I would say to that that I'm not going to dispute that there were certain exchanges and activities that took place during the trial that may not be a model of perfect trial conduct. There was definitely some messiness going on here. Trials are messy affairs. There's no indication in the record that what Ms. Smith was doing in this case was done on purpose or done with any intent to – And none of the questions that have been asked have been meant to suggest such intent. Nevertheless, the result can be the same. Your Honor, the result can be the same. I would just say that during the trial, Judge Gomez repeatedly had colloquies with the prosecutor, and the colloquies that took place on their own stopped the issues as they were occurring. I wouldn't – I don't think that where you had, you know, putting these discrepancies that largely go to the amount of drugs to the side doesn't change the fact that the prosecution proved various elements of a conspiracy and sufficiently proved Mr. Hall's knowledge. And undoing a prosecution where this would, as Judge McKee, I believe, said, seems to be harmless error. I don't think it would have the intended purpose of addressing this conduct in the future. I believe that was addressed when Judge Gomez was dealing with Ms. Smith in the first instance. Thank you, Ms. Gleeson. Mr. Jean-Baptiste, we'll have you back in rebuttal. Let me just indicate at the outset, I think Judge McKee had a question that he wanted to ask and was going to ask it during your rebuttal, so if we could give him that opportunity. The issue of the perjuries that pops up in the Rule 29 hearing, he could explain his argument on that. Can you repeat the question for me, Justice? I think that would – Judge McKee, if I'm mistaken with your question, please let me know. But I think Judge McKee's question was, can you explain why you're concluding that the interaction was pejorious by Mr. Carey? Yeah. If you can rebut it, is it okay? Can you repeat that? I didn't hear you. Well, I answered the question. The question was, is this any clearer? I took off my earpiece. That's better. Yep. Okay, can you repeat the question for me? Okay. Can you tell me? I'm sorry. I believe that Judge McKee was asking whether or not – on what grounds can you say that what happened with Mr. Carey's testimony where he said it wasn't the – it wasn't – I didn't tell the agent about the additional kilos, how was that perjury? Well, because it was certainly an untruthful response, and apparently the government knew it was untruthful at the time, but the government did not come forward and correct the record before the jury. Now, the government took the opportunity to point it out to him that what he just stated was not true of the record. And again, I myself, I don't know how that second evidentiary hearing came about, but it came about, and it was only at that time he offered true examination that what he said before was untrue. So, if, as counsel, I am aware that my client does understand, and he is giving untruthful testimony, and that's what we call subordinate perjury. So, I think it's perjurous testimony, and the government knew, because the government corrected it. Well, the government did not voluntarily. I think the government had a burden to at least come to sidebar and point it out to the court, and then we can deal with it there. But the government did not do it. Now, I wanted to dovetail back to something real quick. The court, Judge Smith, you asked the question about tension before the trial court. And I want to say that the prosecutor in this instance is my friend, my colleague. We practiced together. We practiced in local court before we came into the Federal court. But I have to say that whereas Judge Smith asked about the tension that was existing, I would prefer to this court that the tension exists because the trial court, this is not the first time that a trial court dealt with this prosecutor and the issues pertaining to the prosecutor embellishing facts before the jury. And this court as well, because I have had a number of cases where we've dealt with these sort of issues on appeal. So I believe that the tension, perhaps the tension had something to do with, as Judge Smith pointed out, about the government trying to rehash an issue that the court had already addressed in terms of the severance. But I think that it went to more than that. I think the court, I mean, the government in this instance in cross-examination, the government cross-examined the witness about things that was not testified to before the trial court. That was clearly improper, and the government knew it was improper. I mean, I would not be doing my client any service if I did not state the obvious here. I think that the tension had to do with the fact that the trial court, you know, was somewhat exasperated with the prosecutor in this instance. Now, I want to talk about what this court, well, what the Supreme Court has stated is required for a conspiracy conviction. Guilt is personal and individual, and charges relating to a conspiracy must rest on individual guilt proven beyond a reasonable doubt. I don't think we have that here. My client was convicted on inferences. Nothing but inferences. Inferences upon inferences. And this court has indicated that that is not, you know, permissible in this circuit. And I think that if the court denies, you know, my initial request, which is to set aside a conviction on count one, I think at minimum my client being convicted on this large quantity of drugs, which the government, yes, there was no objection, you know, at sentencing with respect to the drug quantity and whatnot. But I think it's highly improper. I mean, if we're saying that, you know, the government has to prove the conspiracy and prove that, you know, the drugs and so forth that my client is being sentenced on, you know, was possessed and distributed after my client became aware of the conspiracy and entered the conspiracy. I think at best what we have here, three instances of first transaction, two kilos, second transaction, two to three kilos, and the last transaction, four kilos of cocaine. All right, sir. We're well beyond the rebuttal time. Oh, I'm sorry. No, that's all right. Thank you very much. Thank you very much. Counsel, let me just say one thing before we take a very short recess for purposes of seeing if we can improve the quality of the audio here. I trust, Ms. Bleacher, that you will convey to your office the concerns expressed by this panel. I realize that you are not trial counsel, and I also recognize, as some of my questions suggested, that some of what occurred at trial may not have been caused by or the fault of Ms. Smith. Nevertheless, the errors that took place in questioning are patent. They were correctly recognized by the district court who sought to remedy them. And our concern that this happened is something that we have made evident here, but that concern was heightened by the briefing's lack of acknowledgment of it. And I simply ask that you convey to your office in an objective way this court's expression of concern. We'll take a brief recess. Thank you.